UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

     -vs-


MIGUEL RAMOS,
               Defendant.
_____

Indictment No.:21-CR-06126

DEFENDANT'S STATEMENT
WITH RESPECT TO
SENTENCING FACTORS

The Defendant, through his attorney, received the presentence report (PSR). Pursuant to paragraph 10 of the plea agreement, Mr. Ramos respectfully requests that this Court consider a sentence outside of the Sentencing Guidelines range.

## I.   INTRODUCTION

As an initial matter, the Mr. Ramos has pleaded guilty and acknowledges his guilt in the instant offense. He accepts responsibility for his conduct, understanding that his offense requires the appropriate attention of the court. The Defendant stands before this Court in more trouble than he has ever imagined possible. He has embarrassed himself and humiliated his family by being involved in this matter In fact, he had been warned by his family prior to going downtown. The time he has spent preparing for his sentence, has been a "wake up call" to the reality of where a life of drug dealing can lead. Accordingly, the Defendant has already experienced substantial rehabilitation and is dedicated to never again making the mistakes in judgment that lead to his becoming involved in the instant offense.

Mr. Ramos has admitted his involvement in the events of May 30, 2020. He showed up at the Public Safety Building without a political agenda. He has no prior criminal record and had

always led a law-abiding life. He has always had respect for police. Unfortunately, egged on by acquaintances, he got caught up in the moment and participated in the riot. His actions are on camera and he is very remorseful for what he did. It was not the way he was raised, and he knows that what he did was wrong. He acknowledges his involvement, entered his plea and now stands before the Court for sentencing.

Of course, the Defendant recognizes that the offense requires the appropriate attention of this Court and in submitting this Memorandum it is not suggested that the Defendant not be held accountable for his actions. It is requested, however, that the Court carefully consider all relevant factors in determining the appropriate sentence in this case. These factors include not only the Defendant's conduct that lead to his arrest and conviction, but also the Defendant's conduct since being charged and pleading guilty. Accordingly, the Defendant raises the following issues to consider in imposing sentence upon the Defendant.

## II.    FAMILY AND COMMUNITY SUPPORT

Throughout the pendency of this matter, Mr. Ramos has been supported by family members, particularly his mother, Lourdes Cuevas. Ms. Cuevas' letter of support is annexed hereto as Exhibit A. Her letter describes a kind and loving son, who had not given her any trouble until now. They endured his learning disabilities, brought on by exposure to lead paint at an early age, and they have remained close through this matter.

Also annexed hereto, as Exhibit B, is a letter from Edna Robinson, a school social worker who worked with Miguel and his family at Abraham Lincoln School #22. She describes Miguel as thoughtful and kind hearted. She also describes his struggle with ADHD as he was growing up. Rita Ross, Miguel's sixth grade teacher, also writes a letter of support, annexed hereto as Exhibit C.

Although shocked and disappointed by Miguel's conduct in this case, she knows the promising young man that he continues to be, and she remains supportive. Finally, as Exhibit D, we attach a letter from Nuri Simmons, Miguel's fiancé, describing their relationship and Miguel's plans for the future.

Miguel Ramos has strong family and community support. Sadly, he did not listen to those family members that day, and he now finds himself convicted of a crime and facing incarceration. He has learned to heed the advice of his family and to keep himself on a more law-abiding course as he moves forward.

## III.   LEAD PAINT EXPOSURE

Miguel Ramos was exposed to lead paint poisoning for the first three and a half years of his life. At age nine, he was evaluated to determine the effects. A copy of the Forensic Neuropsychological Evaluation, prepared for the lawsuit, is annexed hereto as Exhibit E.  The findings include a full scale IQ of 88, 21st percentile, within the low average range.

## IV.   THIS COURT SHOULD SENTENCE THE DEFENDANT TO THE LOWEST POSSIBLE SENTENCE BASED ON SEVERAL MITIGATING FACTORS .

In the instant case, several mitigating factors merge that are not adequately taken into consideration by the operation of the Sentencing Guidelines.

As this Court is no doubt aware, a sentencing court has vast discretion in determining the appropriate sentence to impose. United States v. Koon, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

The United States Supreme Court reaffirmed the importance of reserving sentencing

discretion to federal district court judges,  holding that:

> the federal sentencing statute . . .  Requires a
> sentencing court to consider Guidelines ranges . . .,
> but it permits the court to tailor the sentence in light
> of other statutory concerns as well.

*United States v. Booker*, 543 U.S. 220, 245-246 (2005).

District courts are required to calculate accurately the Guidelines sentence before considering the '3553(a) factors.  *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010). Once the district court properly calculates the guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant, and accordingly, must conduct its own independent review of the Section 3553(a) sentencing factors.  *Id.*

18 U.S.C. Section 3553(a) directs the sentencing court to consider factors (1) thru (7) and to impose a sentence sufficient, but not greater than necessary to meet the purposes of sentencing.  Factors (1) thru (7) are as follows:

(1)     The nature and circumstance of the offense and the history and characteristics of the defendant;

(2)     The need for the sentence imposed;

(3)     The kinds of sentences available;

(4)     The kinds of sentences and the sentencing range established [by the sentencing guidelines];

(5)     Any pertinent policy statement;

(6)     The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     The need to provide restitution to any victims of the offense.

Sufficient, but not greater than necessary is referred to as the parsimony clause. *Williams*,

475 F.3d at 476. The district court must impose sentence considering the factors mentioned in '

3553(a)(1) thru (7), and the sentence must be sufficient, *but not greater than necessary. See id.*

at 476 (emphasis added). Thus, the parsimony clause requires a sentencing court to impose the

lower of two sentences when the court concludes that either of two potential sentences would

properly serve the statutory purposes of ' 3553. *See United States v. Ministro-Tapia*, 470 F.3d

137, 142 (2d Cir. 2006).

U.S.C. ' 3661 directs that no limitation shall be placed on the information which the

court may receive and consider for the purpose of imposing an appropriate sentence.

The importance of individualized sentencing is a central theme in federal criminal law.

> It has been uniform and constant in the federal
> judicial tradition for the sentencing judge to
> consider every convicted person as an individual
> and every case as a unique study in human failings
> that sometimes mitigate . . . The crime and
> punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113 (1996).

Further, the Supreme Court reminded the district courts that:

The sentencing judge - - - has greater familiarity with . . . the individual defendant before him
than the commission or the appeals court. . . . He is therefore in a superior position to find facts
and judge their import under ' [3553(a)] in each particular case.

*Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (internal quotations omitted).

A sentence at the lowest possible level is warranted based upon the Defendant's sincere

remorse and efforts at rehabilitation since the commission of the instant offense. Evidence of his

rehabilitation includes the Defendant's voluntary and plea of guilty, acceptance of personal

responsibility, sincere remorse, and desires to improve his life, and cooperation with the authorities.

Every circuit that has considered the relationship between acceptance of responsibility and

rehabilitation in light of the <u>Koon</u> decision has held that post-offense rehabilitation is a valid mitigating factor for a court to consider in imposing sentence. See; *United States v. Core*, 125 F.3d 74, 78 (2nd Cir. 1997); *United States v. Brock*, 108 F.3d 31, 34 (4th Cir. 1997); *United States v. Sally,* 116 F.3d 76, 79 (3rd Cir. 1997); *United States v. Kapitzke*, 130 F.3d 820, 823 (8th Cir.1997); *United States v. Rhodes*, 145 F.3d 1375, 1383 (D.C.Cir. 1998); <u>United States v. Jones</u>, 158 F.3d 492, 502-03 (10th Cir.1998); *United States v. Rudolph*, 190 F.3d 720, 722-23 (6th Cir 1999); and *United States v. Green*, 152 F.3d 1202

The Defendant would submit that since the commission of the instant offense, he has made extraordinary attempts at turning his life around.  He has attempted to make reparations to society by accepting personal responsibility for his actions and pleading guilty. Moreover, he is extraordinarily remorseful for his criminal conduct.  The Defendant has learned a difficult lesson and has already experienced substantial rehabilitation.  Accordingly, the Defendant is truly repentant for his crime.

Through his plea of guilty and extraordinary acceptance of personal responsibility, he has demonstrated a commitment to rebuilding his life, and has made real gains toward turning his life around.  For these reasons, the Defendant would submit that this Court should sentence the Defendant to the lowest possible point authorized by law.

## V.    NO FINE SHOULD BE IMPOSED, BASED UPON THE DEFENDANT'S INABILITY TO PAY.

The Defendant next contends that the PSI correctly recommends that the Defendant does not have the ability to pay a fine in the prescribed guideline range. PSR ¶¶ 84. Mr. Ramos submits that no fine should be imposed.

This Circuit has found that, although the defendant has the burden to prove that he cannot

pay a fine, he can meet this burden by "an independent showing, or by reference to his pre-sentence report." *United States v. Rivera,* 22 F.3d 430, 440 (2nd Cir. 1994).  A fine may be imposed where a defendant arbitrarily refuses to disclose pertinent information regarding his finances. *United States v. Rosa,* 11 F.3d 315, 344 (2nd Cir. 1993).

The Sentencing Guidelines, under §5E1.2(d), give specific elements which are to be considered by a district court in deciding whether or not to impose a fine.  Among the enumerated items to consider are "the burden that the fine places on the defendant and his dependents relative to alternative punishments."

The Defendant would submit that he also has no future ability to pay a fine.  In the event the Defendant is allowed to participate in the Inmate Financial Responsibility program, any extra monies he earns should go to addressing his future and his potential for a law-abiding life once he has completed his sentence.  If a fine is imposed, it will result in funds being diverted from his family. The Defendant submits that monies earned would be better placed with his son, rather than the government.  For this reason, no fine should be imposed.

## VI.   MR. RAMOS REQUESTS THAT THIS COURT RECOMMEND HE BE SENTENCED TO A FACILITY NEAR ROCHESTER, NEW YORK.

Mr. Ramos' mother, sister, and fiancé all reside in Rochester, New York.  It is requested that, to the extent possible, this Court recommend that Mr. Ramos' prison sentence be served at a facility near to his family in the Rochester, New York area.

## VII.   MR. RAMOS REQUESTS THAT THIS COURT RECOMMEND THAT HE PARTICIPATE IN THE BUREAU OF PRISONS DRUG REHABILITATION PROGRAM.

The Defendant respectfully requests that this Court, as a part of the sentence imposed upon

him, authorize the Defendant to participate in the Bureau of Prisons' Drug Rehabilitation Program pursuant to the Bureau of Prisons' Program Statement 5330.10.

On May 25, 1995, the Federal Bureau of Prisons promulgated Bureau of Prisons' Program Statement 5330.10, which established the Federal Bureau of Prisons Drug Treatment Program. The residential drug treatment program is a nine-month intensive rehabilitation program for inmates with substance abuse problems. The Program provides for up to one year reduction in sentence - at the Bureau of Prisons' discretion - for inmates who successfully complete the program.

In the case of the Defendant, his Pre-Sentence Investigation Report establishes that the Defendant has had substance issues in the past.  (PSI ¶ ¶ 75-78). Mr. Ramos began drinking at age eighteen and was consuming a bottle of Hennessy and 1 bottle of Patron every two days.  He began smoking marijuana at age eighteen and was smoking three blunts a day at the time of his arrest.  By age nineteen.  The Defendant now recognizes that he has a substance abuse problem, and that this contributed to his conduct in the instant offense.  Accordingly, the Defendant would respectfully submit that he qualifies for participation in the program and respectfully requests that the Court, as a part of the sentence imposed upon him, authorize his participation in the Bureau Treatment Program.

## VIII.   FACTUAL CORRECTIONS

There are no actual corrections that have been noted by Mr. Ramos.

## <u>CONCLUSION</u>

The Defendant respectfully requests that the Court the factors enumerated above in determining Mr. Ramos' sentence.

Dated: Rochester, New York
       February 1, 2022

Respectfully submitted,

_____
Peter J. Pullano, Esq.
**Tully Rinckey PLLC**
Attorneys for Defendant MIGUEL RAMOS

Office and P.O. Address:
400 Linden Oaks, Suite 110
Rochester, New York 14625
(585) 492-4700
PPullano@tullylegal.com

**UNITED STATES FOR THE WESTERN
DISTRICT OF NEW YORK**
_____

**THE UNITED STATES OF AMERICA**

                                                            **CERTIFICATE OF SERVICE**
    **-vs-**                                    **21-CR-06126**

**MIGUEL RAMOS**
_____

      I hereby certify that on February 1, 2022, I electronically filed the foregoing DEFENDANT'S STATEMENT WITH RESPECT TO SENTENCING FACTORS with the Clerk of the District Court using CM/ECF system which would then electronically notify all CM/ECF participants on this case.

Peter J. Pullano, Esq.
**Tully Rinckey PLLC**
Attorneys for Defendant MIGUEL RAMOS

Office and P.O. Address:
400 Linden Oaks, Suite 110
Rochester, New York 14625
(585) 492-4700
PPullano@tullylegal.com

# EXHIBIT A

To whom it may Concern

Hi my name is Lourdes Cuevas
Mother of Miguel Ramis I would like to
start of by saying I knew what he did
was wrong but let me give you a background
on Miguel was Raised in a home with
4 other Siblings 2 sister and he's twin
brother Myself and he's step DAD Miguel was
about 7 or 8 years old when Angel he's step DAD
Came into our lives Miguel knew how
to Do Roofing Remodeling house I Remember
seeing him at 10-11 years old on top
of a Roof Broken it yes Miguel had
learning disables in School but one
thing I Can say I Never had to go
up to the School for Miguel fighting
Miguel is Kind hearted very Sweet
and loving person Miguel was exposed
to lead At a very young age and Also
ADHD but that Didn't Stop him
from being him everyone loved him
and as he got older that Didn't Change
I Sheltheved him so long I was so
busy Protection him from the world

and running to he's Rescue Not
Realizing I Needed to teach him
about what was outside our home
walls i was he's hands and feet
i Need to Protect them they was
my bbies Also Not Realizing he's
getting odder but in my eye there was
my bbies Miguel Didn't know what it
was to hangout with friends outside
of school till he was 17 Almost 18
years old the only other place Miguel
was allowed to go to was he's god mom's
house she ran a DayCare Center
i think god for her I meet her
when Miguel was 2 months old
and has been in our live since
she has taking Miguel to Do volunteer
work Clean Sweep among other
the every year she Did
Booking giveaway Miguel was always
there we had a Aebor she was
like 70 years old About 3 years old
Miguel would always Come and ask me
mom Can I go to the store for her
I was scared of her cuz she
Always looked mean till one day she
said Hi are you the twins mom

I said yes She said I just wanted
to tell you you have one amazing
kid She Die that same year Miguel
Always made sure She had her coffee
in the mornings her Sandwich
and also made sure She Ate
threw out the Day 2 months before
Miguel found her Die in her
home was her B-day I remember
Miguel mad her a Cake mind you
Nobody Never Come to See or Visit
her Never I Never once since anyone
Visit me Miguel Baked that Cake with
So much love and said mom that's
for grandma I said wat grandma he
said our neibor mom the look on her
face was priceless Miguel is Not
a bad kid not just becouse he's my
Son but I wouldn't trade him
for Nohing in the world All miguel
Knew was me and he's siblings
Srry but he's sperm donor is was
and Never be No good Never was a part
of their live I pluky made a promise
that I would Do any and anything
to protect them from him and to make
Sure my kids would be Nothing like
him that man has been in and out

of Jail since I could remember
he was Physically mentally and
emotionally abusive and Never made
affect to change of Even be in he's life
Angel stepped up and took he's role
Did things would the Day I could
Never Do man to man was always
in school Activities graduation Award
i remember angel telling me
there boys let them be boy
Stop sheltering them so much
let them make mistake it how
he's going to learn and be who we
raised them to be if you Keep
Sheltering him once they get a little
bit of the outside world
he's Not gonna Know how to act
mind you I been hearing him say
that since Miguel was 9 years old
but no in my eyes he's my bby
I wanted to protect him
from anything and anyone
Judge I could Go on and
on I Just want you to Know a little
Background and that Miguel is a good
Kid everyone Deserves a second Chance
and Miguel is one of them he's Not

A troble Kid Never gave me
Issue yes it wasn't easy raising
5 Kids 1 disabled daughter and
Miguel and he's twin brother who
both have ADHD but I wouldn't
trade it for Nothing in the world
yes I would make some Changes
if I Could like letting Miguel be
A Kid and see the outside world and
wat it feels like instead of
being home 24/7 day a week if I
wasn't outside or I Couldn't see
him in sight he was alway in
the house and Im srry for that
no one is perfect I thought I was
doing good instead of wrong
I Can't take it back but one
thing for sure I raised one hell of
a kid srry for Cursing Judge but
like I said I Could go on and one
but I will end it here Judge Srry
for the sloppy handwriting but I wrote
this with my heart I'm Not trying
to maku it look perfect and again I
Apologize you may look at this and be
like wat the heck and I Apologize
                    Sincerly
                        Miguel Ramos Mom
                    Lourdes Cuevas

# EXHIBIT B

December 20, 2021


To Whom It May Concern:


My name is Edna Robinson and worked with Miguel Ramos and his family when I was a school social worker at Abraham Lincoln School #22, Rochester City School District. I was asked by Miguel and his mother to write a letter describing my interactions with him when was in school.  My interactions with Miguel were extremely positive during his years at the school.  Miguel was thoughtful and kind hearted. He was not violence but was impulsive and was easily distracted. As I recall he was diagnosed with ADHD and was being treated for it via medication.  Counseling was an additional intervention, and I was able to redirect him and he would react appropriately and positively.  He received counseling over the years and was responsive during our sessions.

Miguel's mother Lourdes Cuevas and I have kept in contact since Miguel, his brother and sisters moved on to high school.  During his time at School 22, Ms. Cuevas was committed to working with school staff on behalf of her children. She came to school often for meetings and supported her children's participation in school events.  Being a single parent was tough, but she was determined to see that her children were successful.  Recently Ms. Cuevas reached out to me letting me know that Miguel had legal challenges, and ask if I would provide counseling to him. I have agreed to work with him.

If you have any questions or concerns, please contact me at 585-820-9955.

Sincerely,

Edna Robinson, LMSW

# EXHIBIT C

**From:** rita gaston <ritajg4@yahoo.com>
**Sent:** Monday, December 6, 2021 12:53 PM
**To:** Peter J. Pullano <PPullano@tullylegal.com>
**Subject:** Miguel Ramos

Good afternoon and I hope this email finds you well....

My name is Mrs. Rita Ross and I am writing on behalf of Miguel Ramos.

I have known Miguel for about 8 years and I have had the pleasure of being Miguel's sixth grade teacher quite some time ago.

As a student, Miguel was focused and motivated to do well in class.  If there was an area that required more effort, Miguel was more than willing to put forth that effort to ensure the task at hand was not only completed, but completed correctly.  The progress he made in that school year showed his motivation and ambition to do well.

When I learned of his situation and him having to go into the judicial system I was shocked and disappointed yet I was hopeful.  Hopeful because I know the young man he has always bee and continues to be.  This same 6th grade student that I had 8 years ago continues to prove and show himself to be a hard-working, ambitious and motivated, young man he knows and I know he can be.

Miguel is an amazing young man and I'm sure he will do all that he can to have a promising future. I truly believe in him and hope that others will as well. If you need to contact me, please feel free to do so through email or phone at 585-857-1619.

Thank you for your time,

Mrs. Ross

Received, thank you.      Got it.      Got it, thanks!

Reply          Forward

# EXHIBIT D

Nuri Simmons
1347 Dewey Ave. Apt#5
Rochester, NY 14613
December 16th, 2021

To whom this may concern,

Hello, my name is Nuri Simmons. I am Miguel Ramos's fiancé. I am writing this letter to convey my support for Miguel as he deals with his current legal matters. I would also like to illustrate how Miguel is not a reflection of the unfortunate events that caused these proceedings. In addition to being a character witness I am also a victim of a violent crime and ask the court to consider the totality of the circumstances. I ask the court to consider the impact of what any sentence could possibly create.

First, I want to give some background about Miguel and myself. We have been friends for about 3 years and dating for about 1 year. Over time I've gotten to know Miguel on a personal level. We are in love. I love his family and his best friend. My family loves him, and his family loves me. I've been there when Miguel is at his best and when he's had his moments of acting out of character. These legal issues have affected our relationship. We've recently got engaged and have been preparing for these upcoming proceedings. We are looking forward to having our first official Christmas as an engaged couple. With these legal proceedings looming over our lives, it's been a struggle to maintain our joy this season.

From my experience, Miguel is such a kindhearted person. He does small acts of kindness at random times. Anytime we're driving he wants to stop and give something to people on the side of the road. Some may look at them as "bums" and "panhandlers", but Miguel sees a part of him in everyone. He sees the human. He can relate to their struggle and the feeling of not having anyone to support you. He helps care for his niece and other family members. He can be very helpful and giving even when he doesn't really have anything to give. He can be so selfless; at times I have to remind him that he can't fight all battles and he needs to think of himself and put himself first. On the other side, Miguel can be very emotional. Whenever Miguel is depressed or upset, he shuts down and puts up walls. That's his defense mechanism. He doesn't know how to open up about his feelings, which causes him to make rash decisions at times. This is where Miguel needs help. Communication and critical thinking. One thing I had to comprehend when having encounters with Miguel is that he had severe depression and anxiety. That causes him to shut down. He doesn't know how to reach out for help because he's never felt supported, so he's left with his own devices. He acts out as a cry for help and attention. I try to convince him to confide in me or to seek professional help like myself, but he's accustomed to being alone so much that he's conditioned himself to reject any form of affection or attachment. However, lately he's been trying to form better relationships. Our engagement is an example of that. In total, from my experience with Miguel he is a very kind person who needs mental health intervention.

Recipient Name
December 16th, 2021
Page 2


As a victim of a violent crime, I've witnessed the effects of the legal process and how the suitable sentence can affect all parties. As the victim I felt angry, and I wanted my abuser to face the consequences of his actions. As time went by, I began to think of how the outcome of the court proceedings could impact me and my abuser. My abuser suffered from mental health issues and possibly psychological issues as well. After I was able to accept what took place and the reasons it happened, I understood that a verdict and sentence that lead to jail time would not be appropriate in that case. Yes, I still believe everyone should be help accountable for their actions and the effect of their actions, however, I also believe the sentence should fit the crime giving the totality of the circumstances. My abuser needed professional help from doctors. Jail would not have and will not offer him any value to him. The purpose of incarceration is for people to get justice and to correct and deter bad behavior. How does this relate to Miguel? My situation shares the same set of facts. Miguel needs professional help. He suffers from severe mental health issues that myself nor his mom can get out of him. It took me sometime to understand that in my case. Once I was able to put my emotions aside and think of the best solution for everyone, I understood that mental health issues can cause the best people to make some of the worst decisions. Including myself. Fortunately, none of my decisions were illegal, but if they were I would hate to be judged for a decision I made at my lowest.

In conclusion, any sentence could possibly affect Miguel's life and all the people around him that love and support him. He had a niece that loves him dearly. His family is worried about the direction his life is going in because we all know this is out of character for him. We are starting a new chapter in life as life partners. Things are getting better for Miguel. He's been trying to apply himself for in life. He's been searching for employment. Thinking of going back to school. He's been trying to find things that feed his passion. I can see some progress in his mental health. He has moments when he allows himself to be vulnerable and emotional. I can see that he is consciously trying to better himself. With his upcoming court date, he's been a little more distracted, but he's trying to fight through his depression and anxiety. I hope that the court will consider his background and how his environment led to these irrational events. What he is accused of is not who he is truly is. Miguel is a great person with good intentions. I ask that you find it within you to see the human in him and the struggle he went through and understand that what Miguel really needs is help. I love him and I want to see him overcome this situation. He needs guidance and support that incarceration isn't designed to offer.

Thank you for your time.

Sincerely,

Nuri Simmons

# EXHIBIT E

Peter B. Sorman, Ph.D., ABN
Board Certified Clinical Neuropsychologist
20 Office Parkway, Pittsford, NY 14534
Phone: (585)385-8728 – Fax (585)385-0041
E-mail: drsorman@frontiernet.net
Website: www.drsorman.com
**Independent Medical Evaluation**
**Forensic Neuropsychological Evaluation**

Name: Miguel Ramos
Age: 9
Date of Birth: 2/3/2001
Date of Testing: 10/13/2010
Referred By: Lipsitz & Ponterio, LLC
Current Medications:  Adderall 30mg XR qam (Not on Meds For Testing)

## Reason for Referral

Miguel Ramos is a 9-year-old, right-handed male, currently attending the third grade at the #22 School in Rochester, New York.  Miguel has repeated the first grade twice and has exhibited issues with attention/concentration, impulsivity, and susceptibility to distraction and academic delays. His history is also significant for exposure to toxic levels of lead as a young child. There is question whether Miguel's exposure to toxic levels of lead caused learning disabilities, neurodevelopmental delays, and organic brain dysfunction and/or neurobehavioral disturbances. Independent neuropsychological examination was requested by Lipsitz & Ponterio, LLC to address these questions and to provide prognostic statements.

## Records Reviewed

In advance of the current examination, the following records were received from Lipsitz & Ponterio, LLC and reviewed by this examiner:  Summons and Complaint; Plaintiff's Verified Bill of Particulars; Monroe County Department of Health records; medical records, educational records from the Rochester City School District and the Deposition transcript of Lourdes Cuevas, Miguel's mother (PNG). In addition, Miguel's mother completed a neuropsychological history questionnaire.

## IME Procedures

Miguel was seen for the current independent neuropsychological examination on October 13, 2010 in Pittsford, New York. For the clinical interview only, his mother, who provided additional historical information, accompanied Miguel. For the course of neuropsychological testing, this examiner saw Miguel alone. There were no third party observers present for the entire testing.

Miguel and his mother were advised of my role as independent examiner.  It was explained that the usual doctor-patient relationship does not exist in this circumstance and, therefore, rights to confidentiality would be waived.  Miguel and his mother were asked to provide honest and forthright answers to questions posed. Furthermore, Miguel was asked to provide his best effort on all tests.  It was further explained that results of the current examination would be

**Page 2**
**RE: Miguel Ramos**

shared with Lipsitz & Ponterio, LLC and, in all probability, disseminated to other third parties involved with their pending litigation. Miguel and his mother stated that they understood the terms and conditions of the current independent neuropsychological examination, provided their assent and the examination proceeded accordingly.

To evaluate Miguel's degree of compliance with task demands, a measure of symptom validity, the Test of Memory Malingering, was administered. Results of Trials 1 and 2 of the Test of Memory Malingering revealed that Miguel scored above the 90 percent cut off rate of normative subjects. In concert with behavioral observations noting good effort, this finding suggests that Miguel, indeed, was compliant with task demands. Therefore, unless otherwise indicated, the neuropsychological findings reported here is a reliable sample of Miguel's current capacities.

## History

As indicated above, Miguel is a 9-year-old, right-handed male, currently attending the #22 School in the 3rd grade in Rochester, New York. Miguel repeated the first grade twice, secondary to attention/concentration difficulties, hyperactivity, impulsivity, and delays in reading, writing and math. His pediatrician (and Miguel's school) diagnosed Miguel as having ADHD, which prompted the use of Concerta initially. Miguel complained of stomachaches and the medication was switched to Aderrall XR. Miguel's Mother indicates that he exhibited difficulties with attention and concentration, hyperactivity and impulsive behavior since age 1 and beyond. The pattern of hyperactivity, distractibility, impulsivity was observed both within the school and home settings. His mother reports that Miguel's focusing has improved with the use of Adderall and reduces his hyperactivity. However, despite receiving extra help in reading, writing and mathematics, Miguel is still struggling in school.

Apart from persisting issues with concentration and academic delays, Miguel's mother is also concerned that he has large handwriting. He does not receive occupational therapy. Mom also notes Miguel has occasional sleeping difficulties secondary to his Adderall medication. He also complains of headaches quite often. His medical history also includes asthma and allergies. He takes albuterol, Flovent and Claritin on a p.r.n. basis.

According to the neuropsychological symptom checklist completed by Miguel's mother, she endorses that he has problems with planning and anticipation, word finding difficulties, problems with reading and, math and spelling, being forgetful, having motor coordination problems, and is concerned with his degree of impulsivity. Miguel needs "constant supervision" (according to Mom), as he is impulsive with fire setting. He exhibits temper outbursts at home and in school.

Developmentally, Miguel is one of fraternal twins born at 33 weeks gestation and C-section delivered. He was 4 pounds, 6 ounces at birth. His twin Juan was incubated as he was receiving Miguel's waste (Miguel absorbed the nutrition). His Apgar scores were 7 and 8. At birth, Miguel was briefly cyanotic but responded quickly to blow-by oxygen. He was discharged home with his mother, while brother Juan remained in the Skilled Care Nursery for 2 months.

Page 3
RE: Miguel Ramos

Miguel's mother denies alcohol, cigarette or drug use during the course of her pregnancy. His mother further notes that by age 16-18 months, both of the twins were delayed with their walking and talking and exhibited a short attention span and hyperactivity.

As indicated in the reason for referral section, Miguel's history is significant for lead exposure. The following table illustrates his dates of lead level and concentration:

| Date | Pb ug/dl | Date | Pb ug/dl |
|------|----------|------|----------|
| 04/25/02 | 19.0 ug/dl | 03/02/04 | 15.0 ug/dl |
| 05/21/02 | 14.0 ug/dl | 08/31/04 | 13.0 ug/dl |
| 03/28/03 | 15.0 ug/dl | 10/25/05 | 11.0 ug/dl |
| 07/16/03 | 25.0 ug/dl | | |
| 12/01/03 | 14.0 ug/dl | | |

As the table above illustrates, Miguel's first documented lead level was 19.0 ug/dl at approximately 14 months of age. It persisted in toxic ranges until approximately 3.5 years of age and remained at 11 ug/dl on 10/25/05.

<u>Behavioral Observations/Mental Status</u>

Miguel presented as a 9-year-old, right-handed male, who appeared his stated age. Mood was mildly anxious, while affect shifted from normative to mildly dysphoric. Miguel scored within the elevated range on the Beck Youth Inventory-II Deviant Behavior scale. He denied the presence of suicidal ideation, but endorsed symptoms associated with sleep disturbance and stomachaches. Miguel was properly oriented for person, place and time. No unusual perceptions could be elicited on examination.

As indicated in the IME procedures section, Miguel understood the purpose for this independent neuropsychological examination. Measures of symptom validity suggested that his effort was sufficient and compliant. This paralleled behavioral observations during the course of testing that Miguel, indeed, provided good effort. Therefore, unless otherwise indicated, the neuropsychological findings reported here is a reliable sample of Miguel's current capacities.

<u>Tests Administered</u>

Wechsler Intelligence Scale for Children-IV (WISC-IV)
Wechsler Individual Achievement Test-II (WIAT-II)
Reitan-Klove Lateral Dominance Examination
Reitan-Klove Sensory-Perceptual Examination
Finger Tapping Test
Purdue Pegboard
Trail Making Tests (Parts A & B)
Beery Test of Visuomotor Integration
Halstead-Reitan Neuropsychological Test Battery:
    Seashore Rhythm Test
    Speech-Sounds Perception Test

Page 4
RE: Miguel Ramos

Rudel Cancellation Test
Ravens Progressive Matrices Test
H-T-P
Beck Youth Inventories-II
Clinical Interview
Records Review
Test of Memory Malingering (TOMM)

## Findings

Miguel's general intelligence was evaluated utilizing the Wechsler Intelligence Scale for Children-IV. On this measure, he obtained a verbal comprehension index of 91, 27th percentile, low end of the average range. By contrast, Miguel's perceptual reasoning index of 102, 55th percentile is solidly within the average range. Miguel's full scale IQ of 88, 21st percentile, is within the low average range. Differences between verbal comprehension and perceptual reasoning achieved statistical significance. Miguel also exhibited a range of abilities on his intelligence profile.

Miguel scored within the high average range for pictorial concepts. Average performance was noted for: visuospatial synthesis of complex designs, immediate auditory sequential memory for digits, knowledge of social convention, matrix/non-verbal reasoning, and verbal abstract reasoning. By contrast, low average functioning was noted for: knowledge of vocabulary definitions, letter-number sequencing and simple visual scanning. Miguel scored within the borderline range (5th %tile) for rapid eye-hand coordination of newly learned graphomotor symbols Miguel's processing speed was therefore limited to the 5th percentile. His working memory, a measure of sustained concentration, was limited to the 27th percentile. His processing speed was found to be statistically at variance with his verbal comprehension and perceptual reasoning abilities.

Miguel's visual scanning speed and visual divided attentional functions were also impaired. Results of the Trail Making Part A and B Tests revealed significant slowing for his visual scanning speed by age appropriate standards. Miguel also committed 3 errors on the Trail Making Part B Test. He has considerable difficulty thinking by an "if, then this" type of rule. This difficulty is suggestive of executive dysfunction implicating developmental impairments to frontal and pre-frontal regions of the brain. When Miguel was required to rapidly identify number and geometric targets on the Rudel Cancellation Test, his scanning speed was also quite slowed.

Miguel's issues with visual scanning and visual divided attention are also correlated with motoric problems. He is right-hand dominant and results of the Sensory-Perceptual Examination were all within normal limits. Miguel's motor speed was marginally impaired for his dominant extremity. However, Miguel's fine motor dexterity functions for the right upper extremity, left upper extremity and when both extremities were utilized in unison, were less than the 10th percentile and within the impaired range. This correlates with his performance on the Developmental Test of Visual-Motor Integration where he scored at an age equivalent of 6 years, 5 months.

**Page 5**
**RE: Miguel Ramos**

Miguel's issues with visual scanning and visual divided attention are dissociated from his basic visual perceptual capacities. Results of the Ravens Standard Progressive Matrices Test revealed that in the absence of a motoric requirement, Miguel's visual perceptual skills are at the 75th percentile, which borders the high average range. This finding is consistent with the WISC-IV Block Design Subtest where he performed at the 50th percentile.

Miguel's capacity to discriminate speech-sounds was within the impaired range. Similarly, when required to track auditory rhythmic patterns, his performance was also within the impaired range. These findings are consistent with Miguel's delayed acquisition of language-based skills.

From an academic perspective, Miguel's word reading/decoding was at a 2.0 grade level, 7.4-age equivalent, and 4th percentile with a standard score of 74. His reading comprehension was at a 1st grade, 8th month level, 7.0 age equivalent, 5th percentile with a standard score of 75. Miguel's knowledge of numerical operations was at a 2nd grade, 5th month level, 7.8 age equivalent, 5th percentile with a standard score of 75. His written language capacities with respect to grammar, punctuation and samples of narrative orthography were at a 1st grade, 8th month level, 7.0 age equivalent, 3rd percentile with a standard score of 71. Utilizing the Ability-Achievement Discrepancy Analysis, Miguel's reading decoding, reading comprehension numerical operations and written language skills are all statistically at variance with his predicted abilities.

Results of clinical interview, review of records and Beck Youth Inventories – Second Edition, suggests that Miguel's hyperactivity, impulsivity, susceptibility to distraction, low frustration tolerance and behavioral problems at home and school has been evolving over time and escalating. This has lead to academic failure and repeating the first grade twice. Results of the Beck Youth Inventory-II suggest that Miguel displays significant elevations on the Deviant Behavior scale as well. It is notable that Miguel has had a long-standing history of hyperactivity and impulsivity since early childhood and is on medication for these challenges.

### Opinion

The central questions posed for the current independent neuropsychological examination is whether Miguel's exposure to toxic levels of lead as a child potentially caused learning disabilities, neurodevelopmental delays, and organic brain dysfunction and/or neurobehavioral disturbances. There is also question regarding his long-term prognosis.

Results of the current examination reveals that Miguel is functioning in the low average range of general intelligence. Miguel exhibits significant verbal comprehension deficits, poor visual scanning, impaired attention/concentration, and visual divided attention, speech decoding deficits, developmental coordination disorder consisting of diminished fine motor dexterity functions bilaterally and reductions in his developmental visual-motor integration skills. There is also evidence for delays in reading decoding, reading comprehension, numerical operations and written language skills. Miguel also evidences a high degree of mood variability, impulsivity, anger and deviant behavior indices on the current examination.

When evaluating Miguel's exposure to toxic levels of lead, results of the Monroe County Department of Health records reveal that he was approximately 14 months of age when his lead

Page 6
RE: Miguel Ramos

toxicity was first noted. However, his lead toxicity may have preceded that date. Nonetheless, Miguel's lead toxicity persisted over time, until approximately 3.5 years of age. During these developmental time frames, when Miguel was exposed to lead, critical stages of neuromaturation are occurring. This would include motoric systems involved with fine motor skills, visual-motor capacities, sustained attention and divided attention to task, capacity for written language, numerical operations, speech-sound decoding for reading decoding, and reading comprehension. Though Miguel has retained some perceptual skills, his weaknesses appear to be a mixed hemispheric presentation involving motor, attention/concentration and rudimentary symbol association for higher order reading and written language skills. There is also reason to suspect that his exposure to toxic levels of lead likely produced difficulties with, hyperactivity, poor impulse control and limited judgment. At the present time, Miguel does evidence impulsivity, and an elevated degree of deviant behavior tendencies (even with medication intervention).

It is, therefore, this examiner's opinion, with a reasonable degree of neuropsychological certainty, that Miguel's early and rather protracted exposure to toxic levels of lead are directly and causally related to the cognitive, motoric and behavioral deficiencies noted above. Miguel should be coded as a student with Other Health Impairments and Learning Disabilities while granted accommodations within the school system and direct assistance in view of these limitations.

Miguel's long-term prognosis rests with the degree to which he will receive academic supports to help him compensate for his learning issues. He also has problems with focused concentration and likely requires intervention for his anger management and impulsivity. With adaptive technology, he may be able to bypass his fine motor dexterity and visual-motor delays. He should also be referred for an Occupational Therapy evaluation and treatment in view of motor delays. Miguel's need for an IEP and accommodations will likely be required throughout his schooling. Miguel will likely be suited for simple hands-on work under the guidance of a job coach in a supportive employment program. It is doubtful he will be able to handle the rigors of college, either at a 2 or 4 year level. Miguel will likely require the services of counselors, potential psychiatric input and ongoing management of pharmacologic intervention.

**Attestation**

I, Peter B. Sorman, Ph.D. being a licensed psychologist in the state of New York with Board Certification in Clinical Neuropsychology, hereby affirm that under the penalties of perjury the statements contained herein are true and accurate. The information contained within this document was prepared and reviewed by and is the work product of the undersigned and is true to the best of my knowledge and information. Any changes to the content of this report have been reviewed and reflect the opinion of the undersigned.

Respectfully submitted,

Peter B. Sorman, Ph.D., ABN
Board Certified Clinical Neuropsychologist
Diplomate, American Board of Professional Neuropsychology

Ramos, Miguel
Age: 9
DOB: 2/3/2001
Testing Date(s): 10/13/2010

| TOMM: |
|---|
| Total Correct for Trial 1 = 47 |
| Total Correct for Trial 2 = 50 |

**Lateral Dominance Examination: Right**
Throw a ball: R
Hammer a nail: R
Cut with a knife: R
Turn a doorknob: R
Use scissors: R
Use an eraser: R
Write your name: R

| Reitan-Klove Sensory-Perceptual Examination: | |
|---|---|
| Tactile: | WNL |
| Auditory: | WNL |
| Visual: | WNL |
| Tactile Finger Recognition: | WNL |
| Finger-Tip Number Writing Perception: | WNL |
| Visual Fields: | FULL |

| Finger Tapping: | X̄ | S.D. |
|---|---|---|
| Dominant: Marginally IMP (-1.02 S.D.) | 34.01 | 4.1 |
| 32, 29, 28, 29, 31 | | |
| Average: 29.8 | | |
| Non-Dominant: WNL | 30.51 | 3.3 |
| 30, 26, 29, 28, 28 | | |
| Average: 28.2 | | |

| Purdue Pegboard: | X̄ | S.D |
|---|---|---|
| Right Hand: IMP (-2.71 S.D.) | 13.87 | 1.91 |
| 9, 8, 9 | | |
| Average: 8.7 = <10th percentile | | |
| Left Hand: IMP (-2.72 S.D.) | 12.87 | 2.05 |
| 7, 7, 8 | | |
| Average: 7.3 = <10th percentile | | |
| Both Hands: IMP (-3.05 S.D.) | 11.33 | 1.65 |
| 6, 7, 6 | | |
| Average: 6.3 = <10th percentile | | |

| Trail Making: | X̄ | S.D |
|---|---|---|
| Trail A: IMP (-3.13 S.D.) | 21.59 | 7.5 |

**Ramos, Miguel**
**Age: 9**
**DOB: 2/3/2001**
**Testing Date(s): 10/13/2010**

*2*

45 Seconds, 1 Error

Trail B: IMP (-1.15 S.D.)                    49.53         17.00
69 Seconds, 3 Errors

---

**Developmental Test of Visual-Motor Integration:**
Total Score 12 = Age Equiv. 6 years, 5 months

---

**Seashore Rhythm Test:**
Raw Score: 24/30
Ranked Score: 8
(>4 errors = impaired)

---

**Speech-sounds Perception Test:**
10 errors (Impaired)
(cut off = 7)

---

**Rudel Cancellation Test:**        X (time)  S.D. (time)  X (errors)  S.D. (errors)
"LH" Search:                          91.2       26.4          4            2
WNL (time), WNL (errors)
Time 114 Seconds, 1 Error

"592" Search:                        116.0       33.7          2            2
IMP (time), WNL (errors)
Time 210 Seconds, 0 Errors

"9" Search:                           66.3       21.6          4            3
IMP (time), WNL (errors)
Time 90 Seconds, 2 Errors

---

**Standard Progressive Matrices:**
Total Score: 31 = 75th percentile

---

**Beck Youth Inventory (Second Edition)**

|     | BSCI-Y | BAI-Y | BDI-Y | BANI-Y | BDBI-Y |
|-----|--------|-------|-------|--------|--------|
| RS: | 54     | 4     | 2     | 20     | 22     |
| TS: | 61     | 37    | 36    | 52     | 68     |

**WISC-IV, WIAT-II:**
See Attached

# Tables and Graphs Report for WISC-IV and WIAT-II

| | | | |
|---|---|---|---|
| EXAMINEE: | Miguel Ramos | REPORT DATE: | 11/15/2010 |
| AGE: | 9 years 9 months | GRADE: | 3rd |
| DATE OF BIRTH: | 2/3/2001 | ETHNICITY: | Not Specified |
| EXAMINEE ID: | RAMM | EXAMINER: | Peter Sorman, PhD, ABN |
| GENDER: | Male | | |

| | | | |
|---|---|---|---|
| Tests Administered: | WISC-IV (10/13/2010) | Age at Testing: | WISC-IV (9 years 8 months) |
| | WIAT-II (10/13/2010) | | WIAT-II (9 years 8 months) |

| | |
|---|---|
| Is this a retest? | No |
| Comments: | |

### Composite Scores Summary

| Scale | Sum of Scaled Scores | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Verbal Comprehension (VCI) | 25 | 91 | 27 | 85-98 | Average |
| Perceptual Reasoning (PRI) | 31 | 102 | 55 | 94-109 | Average |
| Working Memory (WMI) | 17 | 91 | 27 | 84-99 | Average |
| Processing Speed (PSI) | 11 | 76 | 5 | 69-87 | Borderline |
| Full Scale (FSIQ) | 84 | 88 | 21 | 83-93 | Low Average |

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

**Tables and Graphs Report for WISC-IV and WIAT-II**

| | | | WISC-IV Composite Scores | | | |
|---|---|---|---|---|---|---|
| | | | Composite Score Profile | | | |
| | VCI | PRI | WMI | PSI | FSIQ | |



| | VCI | PRI | WMI | PSI | FSIQ | |

Vertical bar represents the Standard Error of Measurement.

| Composite | Score | SEM | Composite | | Score | SEM |
|---|---|---|---|---|---|---|
| VCI | 91 | 3.67 | PSI | | 75 | 4.97 |
| PRI | 102 | 3.97 | FSIQ | | 88 | 2.6 |
| WMI | 91 | 4.24 | | | | |

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

## Tables and Graphs Report for WISC-IV and WIAT-II

### Verbal Comprehension Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Similarities | 14 | 8 | 8:2 | 25 |
| Vocabulary | 22 | 7 | 7:8 | 16 |
| Comprehension | 20 | 10 | 9:6 | 50 |

### Perceptual Reasoning Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Block Design | 27 | 10 | 9:6 | 50 |
| Picture Concepts | 20 | 12 | 14:10 | 75 |
| Matrix Reasoning | 19 | 9 | 9:2 | 37 |

### Working Memory Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Digit Span | 16 | 11 | 10:10 | 63 |
| Letter-Number Sequencing | 10 | 6 | 6:10 | 9 |

### Processing Speed Subtest Scores Summary

| Subtests | Raw Score | Scaled Score | Test Age Equiv. | Percentile Rank |
|---|---|---|---|---|
| Coding | 26 | 5 | <8:2 | 5 |
| Symbol Search | 13 | 6 | <8:2 | 9 |

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

**Tables and Graphs Report for WISC-IV and WIAT-II**

## WISC-IV Subtest Scaled Score Profile



Vertical bar represents the Standard Error of Measurement.

| Subtest | Score | SEM | Subtest | Score | SEM |
|---|---|---|---|---|---|
| Similarities (SI) | 8 | 1.04 | Picture Completion (PCm) | | |
| Vocabulary (VC) | 7 | 0.99 | Digit Span (DS) | 11 | 1.08 |
| Comprehension (CO) | 10 | 1.31 | Letter-Number Sequencing (LN) | 6 | 0.85 |
| Information (IN) | | | Arithmetic (AR) | | |
| Word Reasoning (WR) | | | Coding (CD) | 5 | 1.24 |
| Block Design (BD) | 10 | 1.2 | Symbol Search (SS) | 6 | 1.27 |
| Picture Concepts (PCn) | 12 | 1.24 | Cancellation (CA) | | |
| Matrix Reasoning (MR) | 9 | 0.85 | | | |

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

## Tables and Graphs Report for WISC-IV and WIAT-II

**Composite Score Differences**

| Discrepancy Comparisons | Scaled Score 1 | Scaled Score 2 | Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| VCI - PRI | 91 | 102 | -11 | 10.6 | Y | 22.3% |
| VCI - WMI | 91 | 91 | 0 | 10.99 | N | |
| VCI - PSI | 91 | 75 | 16 | 12.11 | Y | 16.3% |
| PRI - WMI | 102 | 91 | 11 | 11.38 | N | 24.1% |
| PRI - PSI | 102 | 75 | 27 | 12.47 | Y | 3.5% |
| WMI - PSI | 91 | 75 | 16 | 12.8 | Y | 16.4% |

Base Rate by Overall Sample
Statistical Significance (Critical Values) at the .05 level

**Subtest Score Differences**

| Discrepancy Comparisons | Scaled Score 1 | Scaled Score 2 | Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span - Letter-Number Sequencing | 11 | 6 | 5 | 2.83 | Y | 7.2% |
| Coding - Symbol Search | 5 | 6 | -1 | 3.55 | N | 44.8% |
| Similarities - Picture Concepts | 8 | 12 | -4 | 3.38 | Y | 13.2% |

Statistical Significance (Critical Values) at the .05 level

**Differences between Subtest and Mean of Subtest Scores**

| Subtest | Subtest Scaled Score | Mean Scaled Score | Diff. from Mean | Critical Value | S/W | Base Rate |
|---|---|---|---|---|---|---|
| Block Design | 10 | 8.4 | 1.60 | 3.01 | | >25% |
| Similarities | 8 | 8.4 | -0.40 | 3.01 | | >25% |
| Digit Span | 11 | 8.4 | 2.60 | 2.87 | | >25% |
| Picture Concepts | 12 | 8.4 | 3.60 | 3.39 | S | 10-25% |
| Coding | 5 | 8.4 | -3.40 | 3.17 | W | 10-25% |
| Vocabulary | 7 | 8.4 | -1.40 | 2.70 | | >25% |
| Letter-Number Sequencing | 6 | 8.4 | -2.40 | 2.63 | | 10-25% |
| Matrix Reasoning | 9 | 8.4 | 0.60 | 2.68 | | >25% |
| Comprehension | 10 | 8.4 | 1.60 | 3.44 | | >25% |
| Symbol Search | 6 | 8.4 | -2.40 | 3.56 | | >25% |

Overall: Mean = 8.4, Scatter = 7, Base Rate = 53.9%
Statistical Significance (Critical Values) at the .05 level

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

Nov 15 2010 12:22PM  HP LASERJET FAX

**Tables and Graphs Report for WISC-IV and WIAT-II**

**Process Summary and Discrepancy Analysis**

| Process Score | Raw Score | Scaled Score |
|---|---|---|
| Digit Span Forward | 7 | 8 |
| Digit Span Backward | 9 | 14 |

| Process Score | Raw Score | Base Rate |
|---|---|---|
| Longest Digit Span Forward (LDSF) | 5 | 79.5% |
| Longest Digit Span Backward (LDSB) | 5 | 15.5% |

**Process Discrepancy Comparisons**

| Process Score | Raw Score 1 | Raw Score 2 | Difference | Base Rate |
|---|---|---|---|---|
| LDSF – LDSB | 5 | 5 | 0 | 97.6% |

Base Rate by All Ages

| Subtest/Process Score | Scaled Score 1 | Scaled Score 2 | Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span Forward – Digit Span Backward | 8 | 14 | -6.00 | 3.62 | Y | 4.2% |

Statistical Significance (Critical Values) at the .05 level

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

Nov 15 2010 12:22PM   HP LASERJET FAX

## Tables and Graphs Report for WISC-IV and WIAT-II

**WISC-IV Total Raw Scores**

| Subtest | Score Range | Raw Score |
|---|---|---|
| Block Design | 0 to 68 | 27 |
| Similarities | 0 to 44 | 14 |
| Digit Span | 0 to 32 | 16 |
| Picture Concepts | 0 to 28 | 20 |
| Coding | 0 to 119 | 26 |
| Vocabulary | 0 to 68 | 22 |
| Letter-Number Sequencing | 0 to 30 | 10 |
| Matrix Reasoning | 0 to 35 | 19 |
| Comprehension | 0 to 42 | 20 |
| Symbol Search | 0 to 60 | 13 |
| Picture Completion | 0 to 38 | |
| Cancellation | 0 to 136 | |
| Information | 0 to 33 | |
| Arithmetic | 0 to 34 | |
| Word Reasoning | 0 to 24 | |
| **Process Score** | **Score Range** | **Raw Score** |
| Block Design No Time Bonus | 0 to 50 | |
| Digit Span Forward | 0 to 16 | 7 |
| Digit Span Backward | 0 to 16 | 9 |
| Cancellation Random | 0 to 68 | |
| Cancellation Structured | 0 to 68 | |
| Longest Digit Span Forward | 0,2 to 9 | 5 |
| Longest Digit Span Backward | 0,2 to 8 | 5 |

**Summary of WIAT-II Subtest Scores**

| SUBTESTS* | RAW | STD | 95% INTERVAL | PR | NCE | S9 | AGE EQU | GRADE EQU |
|---|---|---|---|---|---|---|---|---|
| Word Reading | 72 | 74 | 70-78 | 4 | 13 | 2 | 7:4 | 2:0 |
| Reading Comprehension | 83** | 75 | 69-81 | 5 | 15 | 2 | 7:0 | 1:8 |
| Numerical Operations | 14 | 75 | 65-85 | 5 | 15 | 2 | 7:8 | 2:5 |
| Written Expression | 7 | 71 | 60-82 | 3 | 9 | 1 | 7:0 | 1:8 |

* WIAT-II age-based normative information was used in the calculation of subtest and composite scores.

** Represents Reading Comprehension weighted raw score.

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

## Tables and Graphs Report for WISC-IV and WIAT-II

### WIAT-II GRAPH OF SUBTEST STANDARD SCORES

#### STANDARD SCORES



| Subtest | SS | SEM | Subtest | SS | SEM |
|---|---|---|---|---|---|
| Word Reading (WR) | 74 | 2 | Spelling (SP) | | |
| Reading Comprehension (RC) | 75 | 3 | Written Expression (WE) | 71 | 5 |
| Pseudoword Decoding (PD) | | | Listening Comprehension (LC) | | |
| Numerical Operations (NO) | 75 | 6 | Oral Expression (OE) | | |
| Math Reasoning (MR) | | | | | |

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.
Page 8

# Tables and Graphs Report for WISC-IV and WIAT-II

**Ability-Achievement Discrepancy Analysis**
Date of Ability Testing: 10/13/2010
Ability Score Type: VCI
Ability Score: 91

Predicted-Difference Method

| WIAT-II SUBTEST | Predicted Score | Actual Score | Expected Diff. | Critical Value | Sig. Diff. Y/N | Base Rate |
|---|---|---|---|---|---|---|
| Word Reading | 94 | 74 | 20 | 8.06 | Y | 3% |
| Reading Comprehension | 93 | 75 | 18 | 9.89 | Y | 4% |
| Numerical Operations | 95 | 75 | 20 | 16.16 | Y | 5% |
| Written Expression | 95 | 71 | 24 | 15.16 | Y | 2-3% |

Statistical Significance (Critical Values) at the .01 level

Copyright © 2003 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

P.18          XAR TECRESAL PH   HP52:21 0102 SI voN